UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff, | : | |
| v. | : | Civil No. 3:19CV1218 |
| ONE IRISH SPORT HORSE NAMED CINDA,<br><br>Defendant. | : | August 7, 2019 |
| [CLAIMANT: BELLE ZACHARY] | : | |

**VERIFIED COMPLAINT OF FORFEITURE**

Plaintiff, United States of America, by and through its attorneys, John H. Durham, United States Attorney for the District of Connecticut, and Julie G. Turbert, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Rule G(2) of the Supplemental Rules for Admiralty Maritime and Forfeiture Claims:

**NATURE OF THE ACTION**

1. This is an action to forfeit and condemn to the use and benefit of the United States of America the following property: One Irish Sport Horse Named Cinda (Defendant Horse), for violations of 18 U.S.C. § 981(a)(1)(A) or (C).

**THE DEFENDANT IN REM**

2. The Defendant is One Irish Sport Horse Named Cinda and has an estimated value of $125,000 to $135,000.

3. On August 1, 2019, the Defendant Horse was seized at Just a Folly Farm, 1555 N. Baldwin Road, Oxford, Michigan, pursuant to a federal seizure warrant. The Defendant Horse is presently in the custody of the United States Marshals Service.

**JURISDICTION AND VENUE**

4. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the Defendant Horse. This Court has jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345, and over an action for forfeiture pursuant to 28 U.S.C. § 1355(a).

5. This Court has *in rem* jurisdiction over the Defendant Horse under 28 U.S.C. 1355(b). Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the Defendant Horse pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1), because the acts or omissions giving rise to the forfeiture occurred in this district.

**BASIS FOR FORFEITURE**

7. The Defendant Horse is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it was involved in a transaction or attempted transaction, or traceable thereto, in violation of 18 U.S.C. §§ 1956 and 1957, or pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to an offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), namely wire fraud in violation of 18 U.S.C. § 1343, or conspiracy to commit such offense.

## BACKGROUND AND INVESTIGATION

8. From approximately November 2011 to approximately April 2017, Thomas Murtha (Murtha) engaged in a scheme and artifice to defraud individual victims by falsely representing to them that he would invest their funds and/or conduct real estate transactions for them and remit funds to the appropriate party when, as he well knew, he intended to use the money for other expenses, including payment for personal expenditures.

9. According to a report of the Connecticut Office of Chief Disciplinary Counsel, Murtha was admitted to the bar of the State of Connecticut on May 19, 1981. During the time period relevant to this investigation, Murtha operated a law practice under the name Maher & Murtha LLC in Bridgeport, Connecticut. In September 2016, Murtha resigned from the bar after three grievance complaints were filed against him.

10. During the course of his scheme and as described more thoroughly herein, Murtha fraudulently obtained and/or fraudulently converted over $1,900,000 from numerous victims. As part of his scheme to defraud, Murtha made materially false statements to induce a victim, hereinafter referred to as Victim #1, to invest over $600,000, purportedly for real estate investments. Murtha was also retained to handle real estate transactions on behalf of other victims; Murtha embezzled funds from those victims instead of remitting funds to the appropriate parties. When confronted about missing funds, Murtha sent emails to victims and/or their attorneys; the emails were designed to delay action on part of the victims, and also contained material misrepresentations.

11. The Connecticut Practice Book regulates certain conduct of attorneys who practice within the State of Connecticut. Included in those provisions are requirements related to

the handling of monies received from clients and third parties. The Practice Book requires that "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept by the lawyer and shall be preserved for a period of seven years . . . ." Practice Book, Rules of Professional Conduct, Rule 1.15(b). An account used to hold such funds is often referred to as an attorney's "IOLTA" account, and is an interest-bearing or dividend-bearing account established at certain eligible financial institutions. Interest accrued in these accounts is directed to legal services to help the poor and needy. An IOLTA account can only include client or third party funds, and may not hold the personal funds of any attorney, except funds to pay for bank service charges or obtaining a waiver of fees and service charges for the account. Practice Book, Rules of Professional Conduct, Rule 1.15(a)(5) and (c). Funds handled by an attorney as a fiduciary must be maintained separate and apart from the attorney's personal funds, and monies handled by an attorney as a fiduciary may not be used for any unauthorized purpose. Practice Book § 2-27(a).

12. During the time period relevant to this investigation, Murtha used several bank accounts at TD Bank, including at least two accounts designated as "IOLTA" accounts. Three accounts are relevant for the scheme described herein: TD Bank Account with number ending 4008 entitled Maher & Murtha LLC Attorneys at Law IOLTA Trust Account, Litigation Account ("IOLTA Litigation Account # 4008"); TD Bank account with number ending 5820 entitled Maher & Murtha LLC IOLTA Attorneys at Law, Real Estate Trustee Acct ("IOLTA Real Estate Account # 5820"); and Thomas M. Murtha, Esquire TD Bank account with number ending 6062 ("Murtha's personal account # 6062").

13. On March 29, 2017, this Court issued a criminal complaint and arrest warrant for Thomas Murtha. On April 5, 2017, Murtha was arrested in the Eastern District of Michigan.

14. On August 16, 2017, a grand jury sitting in New Haven returned a four-count indictment charging Murtha with wire fraud, in violation of 18 U.S.C. § 1343. On May 30, 2018, Murtha pleaded guilty to one count of wire fraud in Case No. 3:17CR180 (MPS).

15. On November 16, 2018, Thomas Murtha was sentenced to 78 months imprisonment. Although the parties had disputed whether Victim #1 was, in fact, a victim of Murtha's charged crimes, the Court determined at the sentencing hearing that Victim #1 was indeed a victim of Murtha.

**PURCHASE OF ONE IRISH SPORT HORSE NAMED CINDA**

16. During the course of the criminal investigation, the government learned that some of Murtha's victim's money—including Victim #1's money—was used to purchase a horse.

17. K.F. is the head trainer at Old Westbury Equestrian Center in Long Island, New York. Around October 2015, Thomas Murtha, his wife, and his wife's daughter traveled from Michigan to New York to look at an Irish Sport Horse named Cinda that was being advertised on K.F.'s website. K.F. was the broker for S.R., the original owner of Cinda.

18. On December 2, 2015, the parties agreed to a purchase price of $145,000. Clients have an option to buy the horse outright or lease the horse for one year at an agreed upon price. At the end of the lease, the client can purchase the horse or return the horse. Murtha and his wife agreed to lease the horse for one year for $60,000 plus an insurance premium of $5,020.

19. Two days later, on December 4, 2015, S.R. received a wire transfer in the amount of $65,020 from Murtha's IOLTA Real Estate Account # 5820. That account had been funded in

part with a fraudulently obtained deposit of $250,000 from Victim #1 on October 20, 2015.[1] Although additional deposits and withdrawals occurred in the #5820 account between October 20, 2015, and December 4, 2015, there would not have been enough money in that account to make the full $65,020 deposit for Cinda had it not been for Victim #1's $250,000 deposit.

20.     After several months, Murtha and his wife decided that they wanted to terminate the lease early and fully purchase the horse. Accordingly, a second payment of $81,653.00 was sent to S.R. on March 3, 2016. It was a wire transfer from a Stratford, Connecticut business called Home Comfort Practice Incorporated.

21.     L.W. is the owner of Home Comfort Practice Incorporated. He said Thomas Murtha represented him and his business in a civil matter in 2015 and they became friends. In early 2016, Murtha asked L.W. for a loan of approximately $85,000. The loan was supposed to be for two weeks. Murtha told L.W. where to send it, which L.W. did, but never told L.W. what the money was for. Sometime later, Murtha told him the money was for a horse.

22.     Murtha did not timely pay the loan back to L.W. as he promised. Some months later, in June 2016, L.W. began to "ride" Murtha for repayment. L.W. received two bounced checks from Murtha before s/he was actually repaid. On June 14, 2016, L.W. received a check in the amount of $10,000 payable to Home Comfort Practice drawn on Murtha's personal account #6062. On July 28, 2016, L.W. received a $75,000 check payable to Home Comfort Practice

---

[1] As explained in the government's sentencing memorandum in the underlying criminal case, Murtha defrauded Victim #1 by falsely representing to him that he would invest his money in real estate in Newtown. *See* Docket No. 87 in Case No. 3:17CR180 (MPS), at 7-16. Although the parties disputed whether Victim #1 (referred to H.G. in the parties' pleadings), Judge Shea ultimately concluded that Victim #1 was, in fact, a victim of Murtha in the charged crimes. *See* Ex. 1 (Sent'g Tr. Excerpt at DA75-79). Murtha is currently appealing his sentence and challenging Judge Shea's finding that Victim #1 is a victim.

drawn on the IOLTA Litigation Account # 4008.

23. The $75,000 payment to L.W. was funded by a $209,790.93 deposit into the IOLTA Litigation Account # 4008 on July 27, 2016, the day before the check was made to L.W. Those proceeds derived from a real estate transaction involved in the fraud Murtha perpetrated against Victim #1.

24. On November 14, 2017, an individual residing in Temperance, Michigan, who boarded Cinda told the FBI that the horse had a leg injury and had been seen by two veterinarians. The veterinarians recommended six months to one year rest and treatment.

25. Individual #2 is a member of the "horse community" in Michigan and sees Murtha's wife, her daughter, and Cinda on a regular basis as they compete in shows in Michigan, Ohio, and Kentucky. On May 15, 2019, Individual #2 said that Cinda was competing in a horse show in Ann Arbor, Michigan. Cinda is currently boarded at Just A Folly Farm in Oxford, Michigan. The horse is in very good health and is estimated to be worth $125,000 to $135,000. I have reviewed recent videos purported to be of Cinda from November 2018 and February 2019 riding and jumping in horse shows that have been posted to social media accounts.

26. Individual #2 said that the Murtha's wife and daughter have talked about selling or leasing Cinda because Murtha's stepdaughter will be going away to college in the fall.

CONCLUSION

27. The Defendant Horse was involved in a transaction or attempted transaction, or traceable thereto, in violation of 18 U.S.C. §§ 1956 and 1957, and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A); or that it constitutes or is derived from proceeds traceable to an offense constituting "specified unlawful activity" (as defined in 18 U.S.C. §

1956(c)(7)), namely wire fraud in violation of 18 U.S.C. §1343, and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, the United States of America prays that a Warrant of Arrest *In Rem* for the Defendant, One Irish Sport Horse Named Cinda; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Defendant Horse to be condemned and forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and proper.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY


*/s/ John B. Hughes*
JOHN B. HUGHES
ASSISTANT U.S. ATTORNEY
CHIEF, CIVIL DIVISION


*/s/ Julie G. Turbert*
JULIE G. TURBERT
ASSISTANT U.S. ATTORNEY
ATTORNEY BAR # ct23398
157 CHURCH STREET
NEW HAVEN, CT 06510
TELEPHONE: (203) 821-3700
FAX: (203) 773-5373
EMAIL: Julie.Turbert@usdoj.gov

DECLARATION

I am a Special Agent of the Federal Bureau of Investigation and the case agent assigned the responsibility for this case.

I have read the contents of the foregoing Verified Complaint of Forfeiture, and it is true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of August, 2019.

       */s/ David J. Ford*
DAVID J. FORD
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

pulled out the money. I mean, it's not even like he says to [redacted], oh, I'm sorry, it didn't work out. I'm going to give you back the money of yours that I put in. He pulled it out. As we have in the Government's brief, he pulled out a check, he has Mr. Hu[redacted] who's actually here today, wrote a letter to the Court, has him take out money that was owed to him and then give him two other checks. And some of that goes to his fiancee or his wife, I'm not sure which, and then some goes to him. And nothing goes to [redacted]. I think all the circumstances here point to [redacted] [redacted] being just like any of these other victims that there's just ready cash.

THE COURT: So do I.

Okay. I'm going to overrule the objection with respect to [redacted]. I find by a preponderance of the reliable evidence that [redacted] was a victim. I'll just hit some of the highlights here. We talked about it some already.

The portions of the Defendant's 302 that I read I think support an inference that his intent was fraudulent from the beginning. Again, if it wasn't, one would think he would have tried to provide something later. But it's also consistent with his actions with respect to others. It's his conduct towards [redacted] later, when [redacted]'s lawyers were involved, is also consistent with what he did with folks that he acknowledges he defrauded. He put him off. He

**EXHIBIT 1**

created fake documents and the like.

Again, Attorney Buckley's correct that the initial focus of a fraud is what happens at the initial transaction, but there is the evidence of later events can be used to draw an inference. And I think it's a reasonable inference here.

Furthermore, the handwritten document that I mentioned, which is something that Mr. Murtha provided to ████'s lawyer in response to many inquiries, in Mr. Murtha's own handwriting, confirm the details of the -- largely confirm ██ ████'s memory of the discussions. And the way those deals worked out is so far from what was discussed, without any information or explanation that, again, that is circumstantial evidence that the deals were fraud in the first instance.

In terms of the record, I'm relying on docket 86-13, which is a 302 of the FBI's interview with Mr. Murtha. Document 86-2 which is one of the interviews with ██ ████ in which he said that in 2015 Murtha showed ████t cell phone pictures of four Newtown properties he was going to buy. 86-2 has other valuable information in it about this. 86-3 also is an interview with Attorney Pires who was ████'s attorney. And in ████'s interview, he stated that Murtha said that if the deals ended up losing he would make him whole even if he had to mortgage his own home. That is very similar to the kinds of statements he told many of

these folks here. And so I think finds other support in the record. Murtha told [REDACTED] he would make 5 percent to 10 percent on the investment. Sounds a lot like what he was promising others in terms of interest. None of which happened. And there's no reason to believe, in light of the robbing Peter to Paul type conduct, that it could ever have happened in 2015 when he made these promises. And the handwritten document 86-2 at pages 8 to 10 -- let me just verify that --yes, pages 8 to 10 is the handwritten document. It's actually 8 to 12.

So I am going to make a finding by a preponderance of the evidence that [REDACTED] was a victim here of Mr. Murtha's fraud. There were wire transfers involved with the purchases of the Newtown properties. And in any event, it's relevant conduct as to fraud. So I'm going to make a finding that the $660,000 is, indeed, part of the loss in this case.

And furthermore, based on the submission by Attorney Pires of $1,130 of attorneys fees, there's evidence that Attorney Pires worked with the Government to try to get to the bottom of this. There's evidence of those meetings in the 302's. I believe that under the restitution statutes can reasonably be added as part of the restitution.

That is something the Government was seeking here as I understand it?

MS. LARAIA: That's correct, Your Honor.

THE COURT: So I believe we've covered the Defendant's objections to the Presentence Report at this time, is that right?

MS. BUCKLEY: Yes, Your Honor.

THE COURT: And then did the Government have any objections to any of the factual statements in the Presentence Report?

MS. LARAIA: Just very minor ones, Your Honor. This is incredibly minor. I hesitate to even bring it up. Paragraph one, I think it should indicate that the plea was taken before Judge Martinez.

THE COURT: I was going to make that change, too. It was taken before Judge Martinez.

MS. LARAIA: As I mentioned a couple of minutes ago, in paragraph 14, we believe that [REDACTED] [REDACTED]'s money was likely used for the purchases of two of the properties, and I think it says one in that paragraph.

THE COURT: Okay. That's the last sentence -- no.

MS. LARAIA: If you go to the bottom of page five, the very last sentence that bridges the two pages. Paragraph 14, one of the -- Murtha did acquire the three other properties, acquiring two after [REDACTED] [REDACTED]'s funds had been dissipated. [REDACTED]'s funds I think were likely used for two of the properties and one was acquired after the funds.

THE COURT: What should that sentence say? Murtha did acquire the three other properties, two of which were acquired with [redacted]'s money?

MS. LARAIA: Two which were likely acquired with [redacted]'s money. There's a lot of commingling so I can't say for sure.

THE COURT: Well, in that case we can't say for sure.

MS. LARAIA: But it's fair to say that his money had not been dissipated by the time when two of them were purchased. It had been dissipated I believe when one --

THE COURT: Why don't we do this. Why don't we say Murtha did acquire the three other properties. Some of [redacted]'s money was used to acquire these properties. Is that accurate?

MS. LARAIA: Yes, Your Honor.

THE COURT: I'll order that change. You know which sentence to revise with regard to that?

Okay. What else?

MS. LARAIA: Just the revision to the loss, Your Honor. This is paragraphs 42 and 58. On the Government's memorandum, we had a couple of fairly small changes to the loss figure. In the Government's computation the loss -- and this isn't for restitution -- the loss would be $1,993,337.15.